

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-17-00114-CV
_____

IN THE INTEREST OF O.T., A CHILD

On Appeal from the 276th District Court
Marion County, Texas
Trial Court No. 16-00193

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

The Texas Department of Family and Protective Services (the Department) filed a petition to terminate Mara's parental rights to her one-year-old child, Omar.[1] Pursuant to a verdict rendered by a Marion County jury, the trial court terminated Mara's parental rights after finding that: (1) she knowingly placed or allowed Omar to remain in conditions or surroundings that endangered his physical or emotional well-being; (2) she engaged in conduct or knowingly placed Omar with persons who engaged in conduct that endangered his physical or emotional well-being; (3) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Omar, who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of his removal from her custody under Chapter 262 for abuse or neglect; (4) she used a controlled substance, as defined by Chapter 481, Texas Health and Safety Code, in a manner that endangered Omar's health or safety and, after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance; and (5) termination of her parental rights was in Omar's best interest. *See* TEX. FAM. CODE ANN. §161.001(b)(1)(D), (E), (O), (P), (b)(2) (West Supp. 2017).

On appeal, Mara argues that the trial court erred in submitting in broad form the question of whether her parental rights should be terminated. Mara also argues that the evidence is factually insufficient to support the jury's findings that statutory grounds for terminating her parental rights

---

[1] To protect the confidentiality of the children involved, this Court will refer to all involved parties by fictitious names. *See* TEX. R. APP. P. 9.8(b)(C)(2).

existed and that termination of her parental rights was in Omar's best interest.[2]  We find that Mara failed to preserve her first point of error for our review.  We further find that factually sufficient evidence supports the jury's findings that statutory Ground E existed and that termination of Mara's parental rights was in Omar's best interest.  Accordingly, we affirm the trial court's judgment.

## I.      Mara's Jury Charge Complaints Are Unpreserved

In her first point of error on appeal, Mara complains of the following charge submitted to the jury:

> For the parent-child relationship in this case to be terminated with respect to [Mara], the mother of the child, . . . it must be proven by clear and convincing evidence that at least one of the following events has occurred:
>
> 1.      [Mara] has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;
>
> 2.      [Mara] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> 3.      [Mara] has failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child;
>
> 4.      [Mara] has used a controlled substance, as defined by Chapter 481, Health and Safety Code, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance; . . . .

---

[2]Mara filed a motion for new trial arguing that the jury's verdict was not supported by factually sufficient evidence.

. . . .

In addition, it must also be proved by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the child. Some factors to consider in determining the best interest of the child are:

1.  the desires of the child;
2.  the emotional and physical needs of the child, now and in the future;
3.  the emotional and physical danger to the child, now and in the future;
4.  the parenting ability of the individuals seeking custody;
5.  the programs available to assist those individuals to promote the best interest of the child;
6.  the plans for the child of those individuals or by the agency seeking custody;
7.  the stability of the home or proposed placement;
8.  the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and
9.  any excuse for the acts or omission of the parent.

Now, bearing in mind the foregoing instructions and definitions, you will answer the following questions:

Question No. 1:  Termination of the Parental Rights of [Mara]
Should the parent-child relationship between [Mara] and the child . . . be terminated?

The jury answered Question 1 in the affirmative.

On appeal, Mara argues (1) that the trial court erred in submitting in broad form the question of whether her parental rights should be terminated and (2) that the court's charge "denies due process because there is no distinct finding by clear and convincing evidence that termination was in the best interest of the child, but if so, to which termination ground did such finding, if any, apply."  None of these points of error were preserved.

In this case, the Department sought to terminate Mara's parental rights, as well as the parental rights of Omar's father, Jim.  The jury was separately instructed that the Department was

4

seeking termination of Jim's parental rights under Grounds D, E, and O. The jury charge contained a second question that asked the jury whether Jim's parental rights should be terminated. Jim objected to the submission of Question 2, the question regarding termination of his parental rights, in broad form. Mara lodged no such objection with respect to Question 1, the question involving termination of her parental rights.[3] "As a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion . . . ." TEX. R. APP. P. 33.1(a)(1). Because Mara failed to object to the trial court's decision to submit a broad form jury charge, she has waived this issue for our review.

Additionally, before the jury charge was submitted, Mara asserted neither a due process complaint nor any complaint that Omar's best interest should be decided by a separate question. Instead, these arguments were made for the first time in a motion for new trial. However, "an objection to a jury charge in a motion for new trial is untimely." *In re N.A.L.*, No. 04-13-00159-CV, 2013 WL 4500633, at *4 (Tex. App.—San Antonio Aug. 21, 2013, no pet.) (mem. op.) (citing *Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627–28 (Tex. App.—Dallas 2004, pet. denied)). Thus, "failure to raise a complaint at trial to a jury charge waives review of that complaint on appeal." *In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) (citing TEX. R. APP. P. 33.1; TEX. R. CIV. P. 274). Because Mara's due process argument was not raised prior to the submission of the trial court's charge, we cannot review it. *See id.* at 348–55 (reversing a court of appeals' decision that

---

[3]Mara also failed to inform the trial court that she wished to adopt Jim's objection to the trial court's charge and apply it to Question 1.

the trial court's broad form submission violated a parent's due process right to have at least ten jurors agree on statutory grounds supporting termination because the matter was not raised at trial).

We find that Mara has not preserved her first point of error on appeal. Accordingly, it is overruled.

## II. Factually Sufficient Evidence Supports the Jury's Verdict

### A. Standard of Review

"The natural right existing between parents and their children is of constitutional dimensions." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Indeed, parents have a fundamental right to make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id*. at 500. "[I]nvoluntary termination statutes are strictly construed in favor of the parent." *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick*, 685 S.W.2d at 20).

In order to terminate parental rights, the trial court must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2017); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth

6

of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing. *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam). We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine "whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact[-]finder could not have credited in favor of the finding is so significant that a fact[-]finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. "[I]n making this determination," we must undertake "an exacting review of the entire record with a healthy regard for the constitutional interests at stake." *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "the rights of natural parents are not absolute; protection of the child is paramount." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994) (citation omitted)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

7

### B. The Evidence at Trial

#### 1. Mara's Relationship With Her Other Children

In addition to Omar, Mara had three other children who were not in her care—Mandy, Mark, and Betty. In 2006, while under investigation by Child Protective Services (CPS), Mara admitted that she had used methamphetamine and marihuana. In 2008, during a second CPS investigation, Mara claimed that family violence had occurred. Mara testified that Mandy and Mark lived with their father after she went to jail in 2009 for possession of a controlled substance.[4] In 2014, Mara, who was homeless, was arrested in Betty's presence. Mara admitted that she was using drugs at the time. After Betty also tested positive for methamphetamine, she was removed from Mara's care. Yet, the Department offered Mara family-based safety services (FBSS), and Betty was returned to Mara.

However, CPS began a new investigation in June 2016, when Mara was assaulted by Jim while she was pregnant with Omar. Mara's written statement of the incident, and the testimony of Alisha Riehl, a police officer who was dispatched to the scene of the assault, demonstrated that Jim had grabbed Betty by the hair and pulled the child from Mara's arms. Betty's father, Cecil, also testified that Mara said Jim had pulled out Betty's hair. Yet, Mara claimed at trial that Betty's missing patch of hair after the altercation was due to ringworm. Betty was placed with her father in July 2016 and remained in his care ever since.

---

[4]Mara testified that she had been incarcerated more than five, but less than ten, times since she had children.

### 2. Mara's Drug Addiction

At trial, Mara admitted that she was a drug addict who had used methamphetamine for fifteen years, including while she was pregnant with Omar. While Mara was still working through her FBSS, Lorisha Wilson, an investigator for the Department, testified that Mara's urinalysis was positive for drugs in August 2016. Omar was born on November 8, 2016. Three days later, Mara's hair-follicle drug test was positive for methamphetamine, and the Department obtained temporary managing conservatorship of Omar on December 19, 2016.

Vickie Burns, the Department's conservatorship worker, testified that Mara went to an inpatient rehabilitation program called Nexus from January 31 to March 2, 2017, and was discharged after completing the program successfully. Even though she had completed six court-ordered drug rehabilitation programs in her life, including the recent stay at Nexus, Mara tested positive for methamphetamine again on March 16, 2017. While her urinalysis was negative on April 7, May 23, June 20, and July 21, 2017, Mara's hair-follicle tests on those dates were positive for methamphetamine. Mara admitted to using methamphetamine after leaving Nexus and also acknowledged that Omar had tested positive on July 21, 2017, after he had been in her presence. Thereafter, Mara's urinalysis was positive on August 24, 2017, less than two months before trial. Additionally, Mara testified that she was possibly high on drugs at the hearing in which the trial date was set. Mara admitted to the jury that she had endangered Omar.

### 3. Mara's Relationship With Jim

Karen Corpier, a Court Appointed Special Advocate (CASA), testified that Mara was afraid of Jim. According to Jason Caroll, a sergeant with the Jefferson Police Department, Jim

9

was one of five generals of the Aryan Brotherhood. Sharlotte Porter, a supervisor for the Department, testified that the trial court entered protective orders on May 25, 2017. Although Mara had been ordered by the court not to have any contact with Jim and not to allow Omar to have contact with Jim, Mara admitted that she violated those orders by spending time with Jim while Omar was present. Mara also acknowledged that her failure to follow the protective orders endangered Omar.

Michael Williams, an officer with the Marion County Sheriff's Department, testified that he was dispatched to the scene of a fire on July 6, 2017, after a neighbor reported that she witnessed a "skinny white male running" from Mara's home, which was in flames. Williams testified that Mara was with Betty and Omar when he arrived at the scene and that she had called the sheriff's department earlier in the day to report that her boyfriend had assaulted and threatened to kill her. Burns testified that Mara had admitted that Jim burned down the house. When questioned at trial, Mara confirmed that Jim was at fault, but claimed that the fire was an accident. Yet, Williams, who had assisted the fire department in investigating the incident, testified that the fire was intentionally set.

Although the fire left Mara and Omar homeless, it did not stop Mara from continuing her relationship with Jim. Williams also testified that he saw Mara and Jim together after the fire. Porter testified that, even though protective orders were extended at a July 27, 2017, hearing, she personally witnessed the couple together after the hearing at a McDonald's restaurant. Facebook posts admitted into evidence at trial established that Mara and Jim were together on August 30,

2017. In front of the jury, Mara admitted that she and Jim were in a romantic relationship "on and off" during the pendency of the case.

### 4. Mara's Compliance With the FBSS

Mara acknowledged that she was provided with a court-ordered FBSS plan in this case, which she did not fully complete. Sandra Davis, an employee of Kirkpatrick, a treatment center for women with substance abuse disorders, testified that Mara was discharged for noncompliance with the policies and procedures of the program. Burns testified that Mara was supposed to attend Narcotics Anonymous, but refused and told Burns "that she was not going because it was boring and she wasn't learning anything." While Mara completed her psychological evaluation, drug assessment, thirty-day drug treatment program, and parenting class required by the FBSS plan, Burns testified that Mara refused to provide a specimen for drug testing on one occasion and failed to complete drug counseling, maintain contact with her, complete the Celebration Recovery program, maintain safe and appropriate housing, or maintain employment.[5]

Corpier explained that Mara was unable to provide Omar with a safe environment. After her house burned down, Mara testified that she "was a transient" until six weeks prior to the October 17, 2017, trial, when she moved into "Rehab's Retreat and Ranch" in Kilgore, Texas (the Ranch).[6] Mara admitted that she had been unemployed for a majority of the year. When questioned about her failure to maintain contact with the Department, Mara claimed that Burns

---

[5]Danny Eaves, a licensed chemical dependency counselor, testified that Mara completed two counseling sessions. William Grant, a licensed professional counselor, testified that Mara attended three or four counseling sessions, but did not successfully complete counseling.

[6]The evidence established that Mara was given a vehicle to use for transportation.

11

was "hard to get [a]hold of" and that the alternate Department supervisor was also "impossible to reach."

The jury heard that Mara's second cousin, Shamala Abshire, worked at the Ranch where Mara was then living. Teresa Richenberger, founder and executive director of the Ranch, testified that Mara had signed a one-year contract to remain there. Karen Childress, house director for the Ranch, testified that Mara's six-week stay indicated that she was on target. William Porter, a licensed chemical dependency counselor, said that Mara was currently in a twelve-step treatment program offered at the Ranch, had attended three sessions, and was doing "exceptionally well."

### 5. Mara's Parental Abilities and Omar's Best Interests

Abshire and Cecil described Mara as a good mother who loved Omar. Sally James, Mara's grandmother, testified that Mara was "one of the best mothers [she had] ever seen." Accordingly, Cecil and James testified that termination of Mara's parental rights to Omar was not in his best interest. Burns agreed that Omar was bonded to Mara and appeared to be happy and well cared for by her. Eaves and Corpier also testified that Mara's interactions with Omar were appropriate and that she cared for him.

Richenberger testified that children were allowed to live at the facility and that she had the staff to care for them. She added that the children already living at the facility "flock[ed]" to Mara, who assisted in their care. Richenberger opined that it would be in Omar's best interest to remain with Mara while the rehabilitation program helped "her to get her life on track."

However, Burns and Corpier testified that termination of Mara's parental rights was in Omar's best interest. Corpier explained that Mara had endangered Omar by continuing to use

12

drugs and engage in a relationship with Jim. Even Richenberger, who testified that she had spoken to Mara about Jim, characterized their relationship as "toxic." During cross-examination, Cecil claimed he was unaware that Mara had tested positive for methamphetamine and agreed that such drug use constituted conduct that could endanger Omar's well-being. James also admitted that a good mother would not allow her son to be exposed to methamphetamine.

Dr. Donald Eugene Winstead, III, a licensed psychologist, testified that his review of Mara's clinical interview report led him to conclude that she was likely to value her own needs over those of her children and could become easily stressed with the routine tasks of parenting. He noted that Mara reportedly suffered from panic attacks. According to Winstead, Mara likely had low self-esteem, persistent depressive disorder, a lack of confidence, a dependent personality, and "showed some antisocial features." Winstead explained how such behavior could have a negative impact on children.

Corpier testified that Omar had been placed in a safe environment with a foster family that was appropriately caring for Omar's needs. According to Corpier, Omar was happy in his current placement. Corpier and Burns both testified that the Department planned to offer Omar for adoption and that the foster family might consider adopting him.

After hearing all of this evidence, the jury decided that Mara's parental rights to Omar should be terminated.

### C. Factually Sufficient Evidence Supports the Jury's Finding Under Ground E

"Only one predicate finding under Section 161.001[b](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest."

13

*In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362); *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)); *see In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.).

The Department alleged that Mara engaged in conduct or knowingly placed Omar with persons who engaged in conduct that endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). Endanger "means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family environment." *E.N.C.*, 384 S.W.3d at 803. It "means to expose to loss or injury." *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

"Ground E 'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "The conduct to be examined includes what the parent did both before and after the child was born." *Id.*; *see E.N.C.*, 384 S.W.3d at 804–05. "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)); *see E.N.C.*, 384 S.W.3d at 803; *N.S.G.*, 235 S.W.3d at 367). Rather, "[u]nder subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *In re L.E.S.*, 471 S.W.3d 915, 923 (Tex. App.—Texarkana 2015, no pet.). However, termination under this ground "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of

14

conduct by the parent is required." *Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *N.S.G.*, 235 S.W.3d at 367.

"Because it exposes the child to the possibility that the parent may be impaired or imprisoned, illegal drug use may support termination under" Ground E. *In re A.L.*, No. 06-14-00050-CV, 2014 WL 5204888, at \*7 (Tex. App.—Texarkana Oct. 8, 2014, no pet.) (mem. op.) (quoting *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). "Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.) (quoting *N.S.G.*, 235 S.W.3d at 368); *see J.O.A.*, 283 S.W.3d at 345 n.4 ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child.") (quoting *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.)).

The jury heard evidence that Mara was a drug addict with a fifteen-year history of methamphetamine abuse. Her addiction had subjected her to multiple arrests, once in front of Betty, and had caused Betty to test positive for methamphetamine. Mara used methamphetamine while she was pregnant with Omar, conduct which she agreed endangered his physical or emotional well-being. Even after completing Nexus, Mara continued to abuse the drug during the pendency of the case. She further admitted that Omar tested positive for methamphetamine less than three months prior to trial because he was exposed to the drug while he was in her presence.

15

"A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under subsection (E) even if there is no direct evidence that the parent's drug use actually injured the child." *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287, at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (mem. op.) (per curiam) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)). Here, however, there was direct evidence that Mara's drug use actually injured Omar.

Additionally, the jury heard evidence of Mara's volatile relationship with Jim, who had shown a propensity for violence. Jim assaulted Mara while she was pregnant with Omar. Mara had told police officers and Cecil that Jim had grabbed Betty by her hair during the assault, ripping it from her head. Even though protective orders were entered in this case for Omar's well-being, Mara allowed contact between Jim and Omar. At trial, Mara admitted that she and Jim had a romantic relationship during the pendency of the case. Even after she told others that Jim had burned down her house, causing her, Betty, and Omar to be temporarily homeless, she continued to see him. "A fact-finder 'can consider the history of abuse between the mother and the father for purposes of subsection . . . (E), even if the children are not always present.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied)).

Mara argues that there was evidence that Omar was well cared for. Yet, Mara was unemployed for a majority of 2017 and had not maintained stable housing for Omar, as required by the FBSS plan. After the house fire, Mara testified that she was "transient" until she was

16

admitted to the Ranch. Her prolonged history of unemployment and financial instability was a relevant consideration under Ground E. *See In re M.N.G.*, 147 S.W.3d 521, 539–40 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g); *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied).

While it is true that there was evidence that Mara loved Omar and was a good mother, the evidence also established that Mara's drug use, continued relationship with Jim, and lack of stability established an endangering course of conduct. "In termination cases, '[w]hen there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts.'" *Z.M.*, 456 S.W.3d at 688 (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). Based on all of the evidence introduced in this case, we conclude that a rational jury could readily have reached the necessary firm conviction or belief that Mara engaged in conduct or knowingly placed Omar with persons who engaged in conduct that endangered his physical or emotional well-being. Accordingly, we find the evidence factually sufficient to support the jury's verdict. We overrule Mara's second point of error.

### D. Factually Sufficient Evidence Supports the Jury's Finding that Termination of Mara's Parental Rights Was In Omar's Best Interest

"There is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interest of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2017). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *C.H.*, 89 S.W.3d at 28.

In this case, there was no evidence of Omar's desires. However, several witnesses at trial testified that Omar was bonded to Mara and that Mara loved him. We find that the first *Holley* factor weighs against termination of parental rights. *See Z.M.*, 456 S.W.3d at 689 (citing *E.N.C.*, 384 S.W.3d at 808).

Next, Mara's actions had ultimately led to the removal of all of her children from her care. "Evidence of past misconduct or neglect can be used to measure a parent's future conduct." *In re O.R.F.*, 417 S.W.3d 24, 39 (Tex. App.—Texarkana 2013, pet. denied) (quoting *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied)). Mara had exposed Omar to methamphetamine while he was in her care and had allowed Jim, who had previously ripped the hair from Betty's head during an altercation, to have contact with Omar. Although there was evidence that Mara was a good mother when she was not on drugs, Winstead testified that Mara was likely to put her needs ahead of Omar's. Mara's decision to continue her relationship with

18

Jim, in spite of his affiliation with the Aryan Brotherhood and his propensity for violence, demonstrated that she lacked parental ability. Her continued use of methamphetamine during the pendency of the case indicated that the existing parent-child relationship was not a proper one. Mara's history of drug use, victimization by Jim, and poor life choices lead us to conclude that the second, third, fourth, and eighth *Holley* factors weigh in favor of termination of parental rights.

As to the fifth and ninth *Holley* factors, the Department had programs available to assist Mara, but Mara did not take full advantage of many of those programs during the pendency of the case. Mara failed to complete drug counseling or the Celebration Recovery program. Although she completed an inpatient drug treatment program, Mara relapsed. Burns testified that Mara refused to attend Narcotics Anonymous because she thought it was boring. Mara had transportation and offered no excuses for her failure to take full advantage of the resources provided by the Department. Even though she was making a great effort at drug rehabilitation at the Ranch during trial, in light of her history, the jury was free to question whether Mara's treatment would be successful. We find that the fifth and ninth *Holley* factors weigh in favor of termination of parental rights.

As for the sixth and seventh factors, Mara's plan was for Omar to move in with her at the Ranch. Even if the Ranch could be considered safe and appropriate housing, Mara did not indicate what her long term plans for Omar would be. Mara had been unemployed for the majority of the year and homeless after the fire. The jury could have concluded that Mara had failed to provide Omar with a stable home in the past and could continue her lack of stability. Meanwhile, Omar was placed in a stable home with a foster family. The Department's plan was to place Omar for

19

adoption, and Corpier and Burns both testified that the foster family might consider adopting him. The sixth and seventh *Holley* factors weigh in favor of termination.

Considering the *Holley* factors, and in light of all of the evidence, the jury could have reasonably formed a firm belief or conviction that termination of Mara's parental rights was in Omar's best interest. Therefore, we conclude that the evidence was factually sufficient to support the jury's best-interest finding.

## III.    Conclusion

We affirm the trial court's judgment.


                                        Ralph K. Burgess
                                        Justice

Date Submitted:      February 20, 2018
Date Decided:        March 9, 2018